SUPERVISORS (BALTIMORE & OHIO R. CO. v.). See Case No. 829.

---

## Case No. 13,628.

### In re SUPERVISORS OF ELECTION.

[2 Flip. 228;[1] 3 Cin. Law Bul. 714.]

Circuit Court, S. D. Ohio. Sept. 16, 1878.

CONSTITUTIONAL LAW—SUPERVISORS OF ELECTION—JUDICIAL ACT—OFFICERS OF COURT.

1. The act of congress directing the appointment of supervisors in congressional elections by the circuit judge of the United States for such congressional district as may be reported, pursuant to such statute, is constitutional, and is obligatory on the circuit judge.

2. Such action by the circuit judge is judicial, and does not fall under the head of non-judicial action or such as is ministerial.

3. The constitution declares that congress may, by law, vest the appointment of such inferior officers as it thinks proper in * * * the courts of law. The supervisors are inferior officers. The court is not required to per-

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

form the duties prescribed for these commissioners, but its power is exhausted when such officers are appointed.

[In the matter of the application of sundry citizens for the appointment of supervisors for the voting precincts of the city of Cincinnati.]

The act of congress provides: "Whenever, in any city or town having upwards of twenty thousand inhabitants, there are two citizens thereof, or whenever, in any county or parish, in any congressional district, there are ten citizens thereof, in good standing, who prior to any registration of voters for an election for representative or delegate in the congress of the United States, or prior to any election at which a representative or delegate in congress is to be voted for, may make known, in writing, to the judge of the circuit court of the United States for the circuit wherein such city or town, county or parish, is situated, their desire to have such registration, or such election, or both, guarded and scrutinized, the judge, within not less than ten days prior to the registration, if one there be, or if no registration be required, within not less than ten days prior to the election, shall open the circuit court at the most convenient point in the circuit." The supervisors, to be thus appointed, are then, by subsequent sections of the law, authorized to be present during the registration or voting, take cognizance of what is done, and be present at the counting of the votes, simply with a view to secure fairness and impartiality in the elections and correct returns thereof.

[The law itself directs that these supervisors shall be of opposite political opinions. The court has no discretion in the matter. The law is imperative. The court is bound to execute it, and, under the command of the statute itself, must make these appointments when called for. On motion of the clerk of the court by direction of Judge BAXTER, a number of prominent gentlemen from both parties attended. The following is the argument of Hon. George Hoadly, representing the opposition to the appointment of supervisors.][2]

[2] [Argument of Hon. George Hoadly:

[If your honors please, this is the first time, although this law has been on the statute book for seven years, that the courts of this district have been called upon to administer its provisions. As I read the statute, your honors are sitting in a judicial capacity.

[Judge Hoadly, after briefly reciting the provisions of section 2011, said:

[I am, however, restrained or admonished by the fact that I am in the presence of a court. Such a consideration I confess was not as fully before my mind this morning, as it is now; and that your honors, sitting

---

[2] [From 3 Cin. Law Bul. 714.]

as the circuit court, as part of the judicial government of the United States, are solicited by ten citizens to make certain appointments, of a chief supervisor, and assistant supervisors or deputy supervisors, for the purpose of regulating the political election to be held by the voters of the state of Ohio on the 7th day of October next. I desire to say to your honors that the gentlemen with whom I am associated, and whom I now represent, are governed by no lack of sympathy with the objects of the law. No longer ago than the last Democratic state convention in Ohio it was sufficiently made manifest that the Democratic party in Hamilton county had no sympathy whatever with the violation of any duty or right of any citizen with regard to the elective franchise. With the objects of this law, so far as they are to protect the ballot-box, I, for one, would not consent to represent any party or any citizen not in full and thorough sympathy with it. But, if your honors please, because I am, and those with whom I am associated, are hostile to fraudulent voting, it does not by any means follow that this statute is one that we desire to see enforced. I do not propose to advert to the fact further than merely advert to it, of which your honor politically is aware, that the Democratic party, at the passage of this statute, voted against it in solid column in both branches of congress, and since the passage of this statute have treated, regarded and denounced it as part of an attempt to centralize power, both impolitic and unconstitutional, and have carried their animosity to such an extent as that in the last session of congress, as I am informed, they refused to appropriate moneys towards the pay of those who were engaged in enforcing it, which may, perhaps, be a forecast of the future.

[If your honors please, these considerations are considerations of policy, and not considerations of constitutional law, and infractions of the constitution. I do not deny that in the constitution of the United States it is written in as plain language as words can make it, that while the "times, places and manner of holding elections for senators and representatives shall be prescribed in the state by the legislature thereof, the congress may at any time, by law, make or alter such regulations, except as to the place of choosing senators"; but if your honors please, what I do deny is, that the congress of the United States can be made engines of political action, and what I do appeal to your honors to do, is to follow the example of John Jay and William Cushing, the two first chief justices of the United States; and of James Iredell, of North Carolina, when sitting as a federal judge; and of James Wilson, who was both a signer of the Declaration and a framer of the constitution, and John Blair, when sitting as judges of the circuit court in the state of Pennsylvania, Jay, Cushing, Wilson, Blair, and Iredell, all being then judges of the supreme court of the United States, who, when asked to take an action which was not judicial, refused to do it. I propose to submit to your honors the cases, which show that from the beginning of the federal judiciary until now, its most honored names, all the judiciary concurring, have held, that it has been the cardinal principle that action, such as this seeks to devolve on your honors, shall be rejected, not merely by the people, but by your honors, and the appeal I purpose to make to you in behalf of my associates is that you will follow the precedents of two solemn decisions of the supreme court of the United States, that I present to you, and refuse to perform political duty, no matter if it be enjoined in a statute of the United States; for, in the earlier days of the republic, if not the better, such was the course which the judges of the federal courts followed.

[If your honors please, I shall not delay with the suggestion that while congress may alter or make regulations, they must leave the enforcement of those regulations to the officers of the states; I shall not delay with the suggestion that the officers of the United States are necessarily, by the constitution, the creatures of the executive department of our government; for the constitution in so many words says that every officer of the federal government shall be commissioned by the president of the United States. But I shall ask your honor's attention to the judicial history, because I am reminded again that we are in a court, which shows that action which is not in its nature judicial has uniformly been rejected by the courts of the United States.

[It does not seem to me that I am called upon to argue to your honors the proposition that taking charge of the election of members of congress is not in any respect a judicial action; it does not seem to me that this admits of doubt. I am at a loss to know where to find authorities upon a proposition so patent as that the selection of the administrative managers of an election, or supervisors of an election, is not a function in any respect judicial. Nor is it necessary that I should delay to argue to your honors these propositions which I hasten over, although propositions which I believe to be perfectly well founded. It is not necessary. I say, that I should dwell on this proposition, that the election to be held in Ohio on the 7th of October is not an election merely of members of congress, but is an election as well of state and of county officers, an election in which a judge of the supreme court of Ohio, a member of the board of public works of Ohio, a sheriff of Hamilton county, and other subordinate executive officers of this county, are to be selected; and that whereas congress may make regulations and may alter regulations of the state regarding elections of members

of congress, they have no right by law to intrude upon the election of state or county officers; but, in order that such a regulation may be constitutional, the elections must be separated and identified, so that the people of the state of Ohio, in the management of that part of their concerns which is in no wise federal, may exercise their rights entirely free from interference by federal office-holders. But that is a suggestion which is patent, and needs no discussion. I shall pass on, therefore, to the proposition, to which I invite your honors' attention for a few moments, that by the law of the United States, as repeatedly administered by the supreme court of the United States, any attempt to devolve upon any court of the United States non-judicial action, has not only been disregarded, but resisted by those judges. So that it has become an established proposition that a judge will not, and must not, if called upon by congress to act in a non-judicial point of view, act at all. His duty is performed by non-action, and not by obedience. It is not the case of a law whose constitutionality may be considered as doubtful, and which, therefore, the judge will obey, leaving it to a higher court to pronounce upon, but it is a law whose constitutionality has been condemned from the year 1793 until now, and to obey which involves disobedience both to the spirit and letter of the constitution, and to the precepts handed down to us by our fathers.

[Judge Hoadly then referred to the act relating to invalid pensions passed in 1793, which, he said, while it was not certainly judicial, was far more in the nature of judicial action than the statute which he was considering. He read sections 1 and 3 of the act from 1 Stat. 324. His other references were to the opinions of the courts in the note to the Case of Hayburn, reported in 2 Dall. [2 U. S.] 409; also to the letters of the circuit court of the United States for the state of Pennsylvania, composed of Judges Wilson, Blair and Peters, and for North Carolina, consisting of James Iredell, justice, and Stitgreaves, district judge, to George Washington, president of the United States, dated respectively, April 18, 1792, and June 8, 1792; also to U. S. v. Ferreira, reported in 13 How. [54 U. S.] 40; also to a note prepared by Chief Justice Taney in the same case, on page 52, containing the case of U. S. v. Todd, decided by the supreme court in 1794.

[He continued: It therefore appears that at the time of the adoption of the constitution of the United States, and by the men who made it, in the most solemn form in which it could be transmitted to posterity, by a judgment of the supreme court of the United States, it was established that whenever non-judicial action was sought by congress at the hand of the courts of the United States, it became the duty of those courts to refuse.

[Judge Hoadly was then proceeding to read from the opinion of the supreme court of the United States, at the December term, 1851, in the case of U. S. v. Ferreira [supra], a case arising under the treaty of 1819 [18 Stat. 252], between the United States and Spain, when he was interrupted by the court, who said it was not necessary he should argue that congress could not require of any court the discharge of any duty that was not judicial. That was a proposition too plain for argument. It has not been denied, and would not be denied by the court. The question for discussion, if there was one, was to show that this particular act was not judicial.

[Judge Hoadly: That is a question upon which I must confess my surprise that there should be an intimation of a doubt. That which is required of this court is the appointment of a chief supervisor and associate supervisors of a political election. What is the judicial action under the constitution of the United States? "The judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made or which shall be made under their authority, to all cases affecting embassadors," etc. Within what part of that explicit definition of judicial power does the power to supervise the election of members of congress fall I respectfully ask? It does fall within a provision of the United States constitution, but that provision is not to be found in anything inserted in the constitution relative to the judicial department, but is written in that part of the constitution which relates to the other departments. These decisions show that the judicial work of the courts of the United States is limited by the definition of the constitution, and the executive work of the administrative officers of the United States must be performed by them, and cannot constitutionally be performed by judges of this court. Wherein does the language of this statute relate to or make any part of the judicial grant of the constitution? Wherein does it relate to any case arising under the constitution of the United States? What is there judicial about this work that your honor has to perform here today?

[After reading sections 2011, 2016–2020 of the statute, Judge Hoadly said: Bear in mind that the constitution of the United States contains this clause: "Each house shall be judge of the election returns, and qualification of its own members." Bear in mind that the end and aim of all this is contained in the words I last read: "And on receiving any such report, the chief supervisor, acting both in the facts, and he shall have power to subpœna before him any witnesses, etc., and prior to the assembling of the congress for which such delegate or representative was voted for he shall file with the clerk of the house of representatives all evidence by him taken or information by him obtain-

ed, and all reports to him made." Now, what else is there in this law? I know of nothing. Its purpose is to place at the poll boxes of every precinct in the county a corps of men appointed by the court to see that no fraud is perpetrated, and to give those men the powers to enable them to scrutinize and ascertain if fraud is perpetrated, and to report upon sworn testimony to congress the evidence of such frauds. Is that a case at law or in equity, criminal, civil or otherwise, arising under the constitution of the United States and committed to the judges of the courts of the United States? Why, if your honor please, far more than taking testimony and ascertaining who the poor fellows were that were entitled to invalid pensions for Revolutionary services; far more in ascertaining who the men were entitled under the treaty with Spain alluded to in the case of U. S. v. Ferreira, is the action of this court which is invoked by this law, political action. It is not merely not judicial action, but it is indorsed all over it in such a way that there cannot be any mistake about it—political action. It is judicial action only in this—that it is a function committed to the court, and that is not enough to make it judicial action.

[Judge Hoadly, after reading at considerable length from the decision of Chief Justice Taney in the Ferreira Case, said: What powers have these officers conferred upon them to perform acts, which are not alien to the ordinary course of the process of courts of justice? Your honors may appoint commissioners, but you appoint them for the purpose of taking testimony or for the purpose of hearing testimony, but your honors do not appoint commissioners for the purpose of searching for testimony without regard to information or the bringing of cases; and, if your honors please, when you go further than that, and see that this function is conferred in order that the house of representatives may be informed who has been elected, it appears clear that if these gentlemen are to be appointed as commissioners in any sense of the word preliminary to any judicial controversy, it is a judicial controversy arising in the legislative department, and determined and solvable only by that department. And if it can be so, by some strange reasoning, that these gentlemen are observers of events, who are to gather testimony with a view to criminal indictments to be found thereafter, the hiatus between the performance of the function and the finding of the indictment is too great to justify the analogy to causes arising in equity, where commissioners take testimony to be presented to the court, or causes arising in admiralty, or criminal causes where commissioners hold to bail. I therefore respectfully submit, on behalf of the gentlemen with whom I am associated on this occasion, that we have had handed down to us from the fathers, instructions to the

effect that actions of this kind not only can not be required by congress of the courts, but can not be lawfully performed by the courts, even when asked by congress; and therefore we appeal to your honors in aid of our position, to treat this statute as Chief Justice Jay and his associates of the supreme court of 1793 treated that statute, and to treat this statute as Chief Justice Taney and the supreme court of 1851 treated the three acts with regard to the treaty with Spain, as being a statute calling for an examination of matters that cannot be judicial and are improper for judicial examination. And we are consoled in the thought that in making this appeal to your honors, we are asking you to observe the proper line of a noble and dignified jurisdiction, prescribed by the constitution, and that we have the precedents before us that this step is one which no court can take without converting itself into a court not to hold the scales of justice in cases arising in law and equity between man and man, or state and state, but a court to subserve the ends of politicians in the controversies of party, and an instrument for the revolution of the legislative department which is independent of it.

[I thank your honors for having listened to these remarks from me, and for having permitted me to make this more ample statement of reasons, legal in their character, such as might be addressed to judges by an officer of the court. The political part of this argument I do not submit to your hands. The considerations of policy will be improper to address to a court, but I do ask your honors to consider how large a branch of this argument I am compelled, by the respect which I owe to this court, to omit. It is a consideration well worthy of your honors' attention. A political party, which honestly believes itself to have been defrauded of the presidency by the instrumentality in part of this statute,—a political party numbering more than one-half the voters of the United States, as all the recent elections have shown,—is represented here, so far as this little segment of it is concerned, by myself and my associates before the court, and the question is whether the court shall take political action; and the fact that we are compelled to be silent upon grave political considerations, the fact that they are improper to be introduced because this is a court of justice and not a hustings from which to harangue the people, is itself a fact which characterizes this statute and characterizes the action to be taken under it as necessarily political. Your honors know that were I to go into the argument of the policy of the politics which have grown up about this statute I would be introducing into this court those elements of debate upon which men differ most widely in this country, and whereupon their tempers and imaginations become most heated. And yet what else is it, when your honors are to supervise

an election of members of congress, what else is it but to invite political discussion, to invite political consideration? Your honors are to appoint supervisors of both parties—all parties. Your honors are to recognize party lines and say: "This man shall not be appointed, because if appointed it will make all the supervisors of one party." Your honors are to say: "That man shall.be appointed, because it is necessary to carry out the order which congress has given us to appoint from both parties," for if I take it for granted that your honors will not adopt the precedent of the election of 1876, and fill from both political parties, as was done in the state of Louisiana, by excluding from all but one. May it please your honors, the temptation is one I must resist, and I only allude to the political considerations which group themselves about this statute as suggestive that the work which is allotted to your honors is not, in any sense, and can not be by any skillfullness or subtility of reasoning, denominated otherwise than as political, and can not, I respectfully submit, possibly be conceived of by the ordinary human mind as judicial.] [2]

Before BAXTER, Circuit Judge, and SWING, District Judge.

BAXTER, Circuit Judge. I trust it will not be improper for me to say that I regret having been called upon to perform this duty. But the act of congress imposing the duty is imperative, and if constitutional, must be enforced. Learned counsel have, however, insisted that it is unconstitutional: First, because it requires the courts to perform other than judicial duties; and second, because its enforcement would be an invasion of the rights of the states. Can these propositions, or either of them, be maintained?

The government, we concede, is divided into three distinct departments—the executive, legislative and judicial—each invested with appropriate functions, and neither can be lawfully required to encroach upon the prerogatives of either of the others, without violating the fundamental law from which they all derive their authority. If therefore the act which provides for the appointment of supervisors of elections required the court to perform non-judicial duties, I would follow the precedent of Chief Justice Jay and other contemporary judges, so earnestly commended by counsel, and refuse to enforce it. I heartily concur in principles announced by the learned chief justice. The reasons assigned for declining to execute the invalid pension act are clearly stated as follows: "That neither the legislative nor the executive branches can constitutionally assign to the judicial any duties but such as are properly judicial, and to be performed in a judicial manner * * * that the duties assigned to the courts by the (invalid pension) act

are not of that description. * * * As therefore the business assigned to this court by this act is not judicial, nor directed to be performed judicially, the act can only be considered as appointing commissioners for the purposes mentioned in it by official instead of personal descriptions."

By reference to the act it will be found that it designated the judges as commissioners, to take depositions and make reports to the secretary of war, and authorized the secretary of war to suspend, and congress to revise, their decisions, and hence the learned judge added "that by the constitution, neither the secretary of war nor any other executive officer, nor even the legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court."

But what would have been the decision of the court if the act had required it to appoint commissioners to perform the duties prescribed? The constitution declares that "congress may, by law, vest the appointment of such inferior officers as it thinks proper, in the president alone, in the courts of law, or in the heads of departments;" and under this constitutional grant of power congress has vested the president, the heads of departments and the courts with authority to appoint a great many subordinate officers. Amongst others, the courts have been authorized to appoint their clerks, circuit court, and other commissioners, and this power had been exercised by the judges who declined to enforce the invalid pension act. Why is it supposed the courts would have refused to comply with the statutory command, if the invalid pension act had authorized and required them to appoint commissioners to perform the merely ministerial duties by its provisions imposed? There would have been no greater impropriety in the court's appointing commissioners to perform the duties prescribed by that act, than in appointing clerks or circuit court commissioners under the several acts authorizing them so to do. The terms in which they express their objection to acting in the non-judicial character of commissioners indicate clearly, that without doubt or hesitation they would have appointed commissioners to discharge the same duties. The duty of the courts to appoint subordinate officers when required and authorized so to do by law, has never before been questioned, and cannot be upon the basis of any adjudicated case. All precedents and authority are to the contrary. The state governments, like the national, are divided into separate departments. There is no more power under the state constitutions to impose other than judicial duties on the courts than there is under the federal constitution. And yet by law in several of the states the appointment of judges of elections has been conferred upon the courts, and so far as I am advised the validity of these laws, or the propriety of their enforcement has not been questioned.

---

[2] [From 3 Cin. Law Bul. 714.]

There is a very obvious distinction between the invalid pension act and that under consideration. In the former, the judges were designated and required to act as commissioners. That duty they very properly declined to perform. And if the act under consideration commanded this court to supervise the elections, I should refuse to obey it. But the command is, that this court shall appoint others to perform that duty. The supervisors so to be appointed will be "inferior officers." The constitution authorizes congress by law to vest such appointments in the courts. Congress, by the statute under discussion, has authorized and commanded the circuit judges, when requested by the requisite number of citizens, to make the appointment which has now been asked for. And though this law may conflict with the opinions of counsel and those whose views they represent, as to the proper classification and division of powers between the several departments of the government, the constitution and the act when construed together make the appointment of supervisors a judicial duty which this court cannot decline to perform without a flagrant violation of the obligations imposed upon it by law.

Let us now consider the second objection. Does the act invade the rights of the states? If so, how? I do not anticipate any possible conflict between the state and national authority proceeding from the exercise of the power conferred by this act. Congress has the right to regulate the election of its own members, and by the constitution each house is made the exclusive and final judge of their election and qualification. In the exercise of this jurisdiction witnesses may be summoned and examined, and investigations made into the fairness and regularity of elections. If this may all be done after election, may not congress by law provide safeguards before election to prevent fraud, secure an honest count, and compel correct returns? This is all the appointment of supervisors is intended to accomplish. It is not contemplated that they shall supersede or exercise any part of the authority vested by state laws in the persons acting under state authority. Supervisors can neither admit nor exclude the ballot of any one offering to vote. They are not present to act as judges but simply as witnesses to remain with the officers holding the elections, take cognizance of everything done, and witness the counting of the votes polled with the purpose to secure fairness and impartiality in the conduct of the election. No injustice can possibly result from such action. It is only to those contemplating frauds either in the casting of the votes or in the counting and return thereof that these impartial witnesses provided by the law are a terror. Frauds perpetrated in the election of members of congress are punishable in the courts. And while the supervisors to be selected from opposing political parties, cannot control the elections and are without authority to receive or exclude a vote, or do any act calculated in the slightest degree to intimidate a legal voter, yet they may, after the election, give evidence and secure the conviction and punishment of violators of the law, and to this class supervisors would naturally be obnoxious.

Thus far I have treated the questions argued as original, and as though there were no precedents in the enforcement of this law in other instances to support the views I have expressed. It was remarked in the argument that the protection intended to be given by the statute had not heretofore been invoked in this circuit. The statement is erroneous.

Judge Hoadly: This district is what I said.

THE COURT: The statement is correct in reference to the districts; but the act has been enforced elsewhere in the circuit, as also in other circuits, and so far as I am aware the action of the courts in exercising the powers conferred has not in any instance been objected to.

I think the statute is constitutional; that it is obligatory upon me, and appointments will be made in accordance with its requirements. If after they are made the appointees shall do any act in excess of the powers conferred on them by the law they will be held amenable therefor. Their acts will be their own and not the court's. In making the appointments the court exhausts its powers, and therefore in their selection I wish to act with judicial impartiality, so as to secure men worthy of so important a trust, and for this purpose invoke the counsel and co-operation of good men of every shade of political sentiment who desire that the popular will may prevail and honest elections be secured.

[NOTE. The following is the application made to Judge Baxter, for the appointment of supervisors, and here reprinted from 3 Cin. Law Bul. 714:]

### The Call.

Cincinnati, August 31, 1878.

Hon. John Baxter, Judge of the United States Circuit Court, Sixth Circuit—Dear Sir: The undersigned citizens of Cincinnati, a city having upwards of 20,000 inhabitants, desire to have the election held on the 8th day of October, A. D. 1878, at which a representative in congress is to be voted for, guarded and scrutinized under the laws of the United States, and respectfully request the appointment of supervisors for the several voting precincts of said city, as provided by title XXXVI., Revised Statutes.

| | |
|---|---|
| James McKeehan. | Harry C. Urner. |
| B. F. Evans. | Geo. F. Davis. |
| W. J. Lippincott. | H. Wilson Brown. |
| Geo. W. Jones. | Edmund H. Pendleton. |
| Lewis Glenn. | John W. Hartwell. |
| B. Eggleston. | C. M. Holloway. |
| Richard Smith. | E. W. Cunningham. |
| F. T. Foster. | A. H. Hinkle. |
| C. W. Thomas. | C. W. Bowland. |
| Wm. Means. | H. C. Whiteman. |
| J. A. Townley. | |

[The following note from Judge Hoadly is reprinted from 3 Cin. Law Bul. 722:]

Editor Law Bulletin: Will you please add in connection with my argument before Judge

Baxter what I would have gladly said, had the judge given me the opportunity, on the subject of the attempt to support the power of the courts to appoint supervisors of elections, by the provision of the constitution allowing congress to delegate the appointment of subordinate officials to the courts. I am more free to ask this because the question is in its essential character, political, and because Judge Baxter (of course, undesignedly,) diverted my mind from this provision, by interrupting me, and conceding that the proposed action could not be sustained if it were shown to be non-judicial.

It will be seen at once that unless this power is controlled by the distribution into the three great departments—executive, legislative, judicial—the learned judge has raised a larger question than he has solved. Can it be possible that he thinks congress competent to require the federal courts to administer the patronage of the government, to appoint governors of territories, postmasters, collectors of customs, and of internal revenue? But the supreme court long ago suggested the true solution. In Ex parte Hennen, 13 Pet. [38 U. S.] 257, 258, the supreme court, speaking through Mr. Justice Smith Thompson, used the following language, which is perfectly decisive: "By the constitution of the United States (article 2, § 2) it is provided that the president shall nominate, and by and with the advice and consent of the senate, shall appoint certain officers therein designated, and all other officers of the United States whose appointments are not herein otherwise provided for, and which shall be established by law; but congress may, by law, vest the appointment of such inferior officers, as they shall think proper, in the president alone, in the courts of law, or in the heads of departments. The appointing power here designated in the latter part of the section, was no doubt intended to be exercised by the department of the government to which the appointment of officers most appropriately belongs."

Very Respectfully,            George Hoadly.
Cincinnati, Sept. 20, 1878.